LUMBERMENS MUTUAL CASUALTY COMPANY, Plaintiff–Appellee, Cross–Appellant,

v.

S–W INDUSTRIES, INC., Defendant–Appellant, Cross–Appellee,

Aetna Casualty & Surety Company; Employers' Liability Assurance Corporation, Ltd.; The Travelers Insurance Company; American Home Assurance Company; National Union Fire Insurance Company; Youell & Companies; J.F. Green & Others; H.S. Weavers Agencies, Ltd.; Underwriters at Lloyds, London, Defendants–Appellees.

Nos. 92–4182, 92–4212.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 4, 1993.

Decided Oct. 25, 1994.

Rehearing Denied Dec. 16, 1994.

Michael E. Brittain (argued and briefed), Richard J. Cusick, Mark Yacano, Calfee, Halter & Griswold, Cleveland, OH, for Lumbermens Mut. Cas. Co.

James R. Jeffery, Teresa L. Grigsby, Spengler, Nathanson, Heyman, McCarthy & Durfee, Toledo, OH, Mark E. Klein, A. Thomas Southwick, Anderson, Kill, Olick & Oshinsky, Thomas H. Sear (argued and briefed), Jones, Day, Reavis & Pogue, New York City, for S–W Industries, Inc.

Irene C. Keyse–Walker (argued and briefed), Hugh M. Stanley, Jr., Arter & Hadden, Wayne J. Belock, Licata & Crosby, Cleveland, OH, for Aetna Cas. & Sur. Co.

Edwin A. Coy (argued and briefed), Robison, Curphey & O'Connell, Toledo, OH, for Employers' Liability Assur. Corp., Ltd.

Richard M. Kerger, Marshall & Melhorn, Toledo, OH, Susan Simms (briefed), Simpson, Thacher & Bartlett, Columbus, OH, Barry R. Ostrager (argued), Simpson, Thacher & Bartlett, New York City, for The Travelers Ins. Co.

David L. Lester (briefed), Janik, Lester & Dunn, Cleveland, OH, for American Home Assur. Co. and Nat. Union Fire Ins. Co.

Stanley H. Solomon, New York City, Rex D. Fiske (briefed), Schell & Schaefer, Toledo, OH, for Youell & Companies.

Stephen A. Schaefer (argued and briefed), Schell & Schaefer, Toledo, OH, for J.F. Green and others and Underwriters at Lloyds, London.

David Ross (briefed), Clifford C. Masch, Reminger & Reminger, Cleveland, OH, for H.S. Weavers Agencies, Ltd.

Before: RYAN and SUHRHEINRICH, Circuit Judges; and JOINER, District Judge.[*]

SUHRHEINRICH, J., delivered the opinion of the court. RYAN, J. (pp. 1337–38), and JOINER, D.J. (pp. 1338–39), delivered separate opinions concurring in part and dissenting in part.

AMENDED OPINION

SUHRHEINRICH, Circuit Judge.

Lumbermens Mutual Casualty Company (Lumbermens) filed suit seeking a declaratory judgment as to its obligations under certain insurance policies issued to S–W Industries, Inc. (S–W). Because they also had issued various policies to S–W, Lumbermens named as defendants Aetna Casualty & Surety Company (Aetna), Employers' Liability Assurance Corporation, Ltd. (ELAC), The Travelers Insurance Company (Travelers), American Home Assurance Company (AHAC), National Union Fire Insurance Company (NUFIC),[1] Youell & Company (Youell); J.F. Green & Others (Green); H.S. Weavers Agencies, Ltd. (Weavers) (collectively, "appellee-insurers"). The district court granted summary judgment to each of the insurers on the grounds that the judgment for which S–W seeks indemnification did not come within the coverage provisions of, or fell within exclusions to, each of the various insurance policies. S–W appeals and Lumbermens cross-appeals. We have jurisdiction, 28 U.S.C. § 1332(a)(1); Fed.R.Civ.P. 54(b), and now **AFFIRM,** in part, and **VACATE,** in part, and **REMAND** this case to the district court for further proceedings.

## I.

Carl Viock, an employee of S–W from 1968 to 1981, worked cementing strips of rubber onto rotating drums. As a result, he was continually exposed to the fumes from highly-volatile, toxic cements and solvents as well as various congestive dusts created by the plant's rubber fabricating processes. In 1976, Viock was hospitalized and diagnosed with pneumonia caused by his continual exposure to chemicals at work. Upon his release, Viock returned to work with his doctor's restriction that he work only in a chemical-free and dust-free environment. S–W contended that no such environment existed at its plant and Viock, facing unemployment, had his doctor remove the restriction. Viock

---

[*] The Honorable Charles W. Joiner, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. The district court granted summary judgment to National Union Fire Insurance Company on the ground that S–W had failed to show it had purchased a policy from that insurer. S–W does not challenge this judgment on appeal.

returned to his job and continued to suffer symptoms of his lung disease. Each day, Viock spent his lunch hour connected to an IPPB, a machine used to clear his congested lungs and aid his breathing. Viock's manager at the plant even suggested that Viock bring the IPPB to work so that he would not have to leave the plant during his lunch hour.

Upon his return to work, Viock sought and received benefits under Ohio's Workers Compensation scheme. Union representatives also requested that Viock's work area be ventilated with exhaust fans. S–W responded by offering Viock a respirator and by installing a portable fan near Viock. Nevertheless, by 1981, Viock's condition had worsened and S–W requested that he be examined by the company's physician. The physician concluded that Viock's lung condition had progressed to the point that he could no longer be productive in his job and, accordingly, Viock was terminated on June 1, 1981.

Eight months later, Viock sued S–W alleging that S–W "fraudulently, intentionally and/or maliciously disguised working conditions and/or concealed from [him] and his physician material information and warnings concerning the toxic substances to which [he] was continuously and repeatedly exposed." Mrs. Viock also sued for her loss of consortium stemming from the injuries to her husband. A jury returned compensatory damage awards in favor of the Viocks in the amount of $1,150,000 and assessed punitive damages against S–W in the amount of $2,500,000. The Ohio Court of Appeals affirmed, in full, the Viocks' awards. S–W claims, and it is not disputed, that it has paid this judgment.

In 1986, Lumbermens filed this action seeking a declaratory judgment regarding its liability under certain insurance policies sold to S–W for the sums S–W paid to the Viocks. Lumbermens also named as defendants S–W's other insurers that had policies in force during the applicable period. All parties moved for summary judgment on the question of coverage. The district court granted summary judgment to each of the insurers on the grounds that no coverage existed under any of the various policies at issue and, pursuant to Federal Rule of Civil Procedure 54(b), certified these judgments as final for purposes of this appellate review. Notices of appeal and cross-appeal were timely filed.

## II.

As there are seven appellee-insurers raising some thirty or more points in affirmance of the district court's decision, the needs of clarity and organization demand that certain overarching issues be resolved first. Then, applying the resolution of these issues, the liability of each insurer is considered in turn.

### A. Public Policy

The appellee-insurers contend that, even if their policies can be read to provide coverage for S–W's liability to the Viocks, the public policy of Ohio forbids the enforcement of those provisions on the grounds that an intentional tortfeasor may not seek indemnification through insurance. The Viocks' cause of action, they argue, was based on S–W's intentional torts and, therefore, the judgment which resulted must be borne by S–W alone.

Based upon the Ohio Supreme Court's interpretation of that state's public policy, we hold that Ohio law does not prohibit indemnification of the $1,150,000 that S–W paid in compensatory damages. Ohio public policy does prohibit, however, any indemnification of the $2,500,000 punitive damage award and, to that extent, the district court's grants of summary judgment in favor of the insurers in this case are affirmed.

#### 1. The Viocks' claim

◼ To address the appellee-insurer's assertions of Ohio public policy, we must first review the nature of the Viocks' cause of action against S–W. Viock's injuries undisputedly occurred in the workplace and, ordinarily, compensation for such injuries is restricted in Ohio to an award of workers compensation benefits. *See* Ohio Const. art. II, § 35; Ohio Rev.Code Ann. § 4123.74 (Anderson). The Ohio Supreme Court, however, has recognized that Ohio's workers compensation scheme provides no immunity for an employer's *intentional* torts against its employees. Thus, where an employee's injuries are the product of his employer's intentional torts, recovery may be sought

under the common law. *Blankenship v. Cincinnati Milacron Chems.*, 69 Ohio St.2d 608, 433 N.E.2d 572, 576 (1982).

■ In the context of employer intentional torts, it was necessary to define what actions by employers, other than those taken with the subjective purpose of injuring a specific employee, would be considered to have been "intentionally" tortious. The Ohio Supreme Court first addressed this issue in *Jones v. VIP Development Co.*, 15 Ohio St.3d 90, 472 N.E.2d 1046 (1984). The court stated:

[A] specific intent to injure is not an essential element of an intentional tort where the actor proceeds despite a perceived threat of harm to others which is substantially certain, not merely likely, to occur. It is this element of substantial certainty which distinguishes a merely negligent act from intentionally tortious conduct.

*Id.* at 1051. Thus, the common law element of "intent" encompasses (1) direct intent—a desire or purpose to cause a particular result, and (2) presumed intent—proceeding in the face of a risk that a particular result is substantially certain to occur. The court in *Jones* held that allegations that an employer "knew or should have known" of a very great risk of injury were sufficient to state a cause of action. *Id.* at 1051–52. Though *Jones* was not decided until after the trial in the Viocks' case, the Ohio Court of Appeals applied *Jones* in determining that the instructions given the jury in that case adequately stated the law of intentional torts. *Viock v. Stowe–Woodward Co.*, No. E–84–27, 1986 WL 3254, at *9–11 (Ohio Ct.App.1986).

The appellee-insurers, in invoking Ohio's public policy, assert that S–W was found liable for acts committed with "direct intent" within the framework just discussed. The district court, however, determined that the basis for the jury's awards was S–W's "presumed intent." We agree.

The jury in the Viocks' case was specifically instructed that it need not believe that S–W had a specific intent to injure Carl Viock to hold S–W liable for his injuries. Rather, the jury was instructed on both the "direct" and "presumed" categories of intentional torts. The appellee-insurers argue that the jury had to have believed that S–W acted with "direct intent" because it awarded puni-

tive damages. The question of punitive damages, however, was argued to the jury on the basis that S–W had "reckless[ly] disregard[ed] the rights of another," not on the basis that it was S–W's purpose to injure Viock.

In lieu of a general verdict form, the jury in the Viocks' state-court trial responded to fifteen special interrogatories. The second interrogatory, answered in the affirmative by all eight jurors, asked: "Do you find by a preponderance of the evidence that Stowe–Woodward Company's intentional *conduct* injured Carl Viock?" [Emphasis added.] In awarding $2,500,000 in punitive damages, the jury responded to the seventh interrogatory which asked: "If you find that Stowe–Woodward Company's intentional *conduct* injured Carl Viock, what punitive damages, if any, do you award the Plaintiff?" [Emphasis added.] Twice more, the jury was asked for findings based upon S–W's intentional conduct. The jury was not asked to find that S–W had, as its purpose, to injure Viock, nor do any of the jury's responses justify such an inference.

Based upon the Viocks' complaint, the arguments of counsel, the trial judge's instructions and, most importantly, the jury's responses to special interrogatories, we believe that the Viocks' recovery was premised on this second category—"presumed intent."

## 2. Indemnification of compensatory damages

■ Thus, the question becomes whether Ohio's public policy forbids an employer from insuring against liabilities arising from those acts taken where the employer knew or should have known of a risk that injury to an employee was substantially certain to occur. This question was squarely addressed in *Harasyn v. Normandy Metals, Inc.*, 49 Ohio St.3d 173, 551 N.E.2d 962 (1990). There, the court rejected any "blanket prohibition" and held that the "better view is to prohibit insurance only for those intentional torts where the fact of insurance coverage can be related in some substantial way to the commission of wrongful acts of that character." *Id.* 551 N.E.2d at 965 (quotation marks omitted). The court concluded that, while the presence of insurance may encourage those

who commit "direct intent" intentional torts, "public policy does not prohibit an employer from securing insurance against compensatory damages sought by an employee in tort where the employer's tortious act was one performed with the knowledge that injury was substantially certain to occur." *Id.* at 965–66.

Accordingly, we hold that Ohio public policy does not bar indemnification of S–W's liability to the Viocks arising out of their $1,150,000 compensatory damages awards.

### 3. Indemnification of punitive damages

■ The issue of whether S–W may seek coverage for the $2,500,000 in punitive damages paid to the Viocks, however, is substantially different. In *Harasyn,* the court noted that "because punitive damages are awarded to punish and deter the tortfeasor rather than to compensate the victim, there is a much different and stronger public policy interest against insurance coverage which would indemnify the tortfeasor against punitive damages." *Harasyn,* 551 N.E.2d at 965 n. 3. To date, the Ohio Supreme Court has not ruled directly on the question of whether Ohio's public policy forbids the indemnification of punitive damage awards. The Ohio Court of Appeals, however, has held that such coverage would violate Ohio public policy. *Casey v. Calhoun,* 40 Ohio App.3d 83, 531 N.E.2d 1348, 1351 (1987).

■ Therefore, we think it clear, and now hold, that Ohio law prohibits the indemnification of monies paid pursuant to an award of punitive damages arising out of the insured's own conduct. The district court's summary judgments in favor of the insurers, to the extent of the $2,500,000 punitive damage award, are affirmed.

### B. Implied Exclusion for Changes in the Common Law

■ Most, if not all, of the appellee-insurers argue that, because the policies at issue were sold to S–W prior to the Ohio Supreme Court's 1982 decision in *Blankenship,* those policies cannot now be construed to cover liabilities flowing from an intentional tort suit brought under *Blankenship.* In essence, they urge this court to imply an exception to the broadly worded grants of coverage to the

effect that no liability is covered unless it could have been imposed as of the date the policy was issued. The district court found the insurers' argument persuasive and granted summary judgment to the insurers on that basis. We disagree.

The only Ohio authorities cited by the appellee-insurers in support of their argument are *Home Indemnity Co. v. Village of Plymouth,* 146 Ohio St. 96, 64 N.E.2d 248 (1945), and *Howe v. Crumley, Jones & Crumley Co.,* 57 N.E.2d 415, 418–19 (Ohio Ct.App.1944). These cases, the appellee-insurers contend, stand for the proposition that an insurance contract "freezes in time" the scope of the insured's liabilities for which coverage is provided. We are unpersuaded.

In *Home Indemnity,* 64 N.E.2d at 250–51, the court, faced with an ambiguity in an insurance policy's exclusions, looked to the circumstances surrounding the purchase of the policy to determine the parties' intent. The case does not involve a post-issuance change in the law regarding the village's liability to its employees. Instead, it is a straightforward application of the basic rules of insurance contract interpretation. Similarly, *Howe,* 57 N.E.2d at 418, fails to support the appellee-insurers' contention because the issue, again, was the parties' intent, not a post-issuance change in the law.

We reject the appellee-insurers' argument because it runs contrary to the settled law of insurance. In discussing the risks ordinarily transferred by a liability insurance policy, a leading treatise uses the example of a motor vehicle liability policy:

> Even if the accident occurs in a jurisdiction in which there is a judicial precedent that limits or precludes any liability to the spouse of an injured person, there is *still the possibility that this precedent will be overturned.* This *uncertainty* is *also* within the bundle of risks that is *transferred* to the insurer by the ... policy.

Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 9 (1988) (emphasis added).

■ Here, the broad coverage provisions in S–W's insurance contracts, though issued prior to the *Blankenship* decision, may fairly be read to cover this type of liability and the

insurers have not established a contrary intent. The policies in question are, for the most part, multi-state policies intended to cover S–W's operations in many states. At the time these policies were issued, at least some states allowed intentional tort claims by an employee against his employer. *See Blankenship,* 433 N.E.2d at 576–77, nn. 8–9, 11 (citing cases from Minnesota, New York, Massachusetts, and West Virginia from as far back as 1930). Thus it cannot be said that such liabilities were not foreseeable at the time these policies were issued to S–W.

Nor are we convinced that the *Blankenship* decision amounted to a "change" in the law in the way that the appellee-insurers describe. A cause of action for intentional tort is not new. The most that can be said is that, for the period between the advent of workers compensation and *Blankenship,* employers who committed intentional torts against their employees thought they enjoyed, and during this time many of the lower courts of Ohio provided, immunity from such suits at common law. *Blankenship* did not "invent" or "recognize" a cause of action or "revoke" any employer's immunity, as the appellee-insurers contend. It merely disabused employers (and their insurance companies) of the idea that Ohio's constitution or its workers compensation laws provided any immunity from intentional tort suits. In *Blankenship,* three judges of the Ohio Supreme Court specifically pointed out that "[t]his court has never yet ruled that an employer may intentionally harm an employee and remain immune to civil suit." *Blankenship,* 433 N.E.2d at 579 (Clifford Brown, J., concurring). Such suits have always existed at common law and, absent an unequivocal intent in the statute or constitution to abrogate it, "the common law right of action against an employer . . . for intentional torts *remains." Id.* (emphasis added).

Therefore, we hold that these insurers may not avoid coverage, where the plain language of their policies clearly provides it, on the basis that a suit such as the Viocks' probably, although not certainly, would not have been successful at the time the policies were issued.

## C. Plain Language Arguments

S–W's various policies can be classified into four general categories: (1) Comprehensive General Liability policies (GCL's); (2) Workers Compensation and Employers Liability policies (WC/EL's); (3) Excess or Umbrella Liability policies (E/U's); and (4) Work–in–Progress policies (WIP's). Each of the insurers make "plain language" arguments to the effect that no coverage for S–W's liabilities exists. These arguments are considered in turn.

### 1. GCL and E/U policies

The GCL and E/U insurers contend that no coverage exists because the plain language of their policies limits coverage to those injuries "caused by or arising out of an occurrence." An "occurrence" is defined as "an event, including continuous or repeated exposure to conditions which result in Personal Injury or Property Damage *neither expected nor intended from the standpoint of the insured."* [2] [Emphasis added.] The insurers argue that injuries resulting from an intentional tort must, by definition and in every case, be "expected or intended" and are, therefore, not the product of an "occurrence." The district court agreed and granted summary judgment to these insurers on this basis.

After reviewing Ohio law, we are not persuaded that the Ohio courts would, as a matter of law and in every case, exclude coverage under an "expected or intended" clause for every liability arising out of an employer's intentional torts. We hold, instead, that the question of whether S–W "expected or intended" Viock's injuries is a question of fact. We further hold that this fact question is not coextensive with, and therefore is not determined by, whether S–W's conduct was found to constitute an "intentional" tort under the law of Ohio at the time of the Viocks' trial. Because the record raises a genuine issue as to this material question of fact, the summary judgments of the district court on these grounds are vacated.

**2.** While the precise language of any one particular policy may vary from that just quoted, the variations are immaterial to our analysis and, for ease of discussion, are disregarded.

The Ohio Supreme Court has stated that the purpose of the "expected or intended" clause is to "prevent[ ] individuals from purchasing insurance as a shield for their *anticipated* intentional conduct." *Preferred Mut. Ins. Co. v. Thompson,* 23 Ohio St.3d 78, 491 N.E.2d 688, 691 (1986) (emphasis added). The clause seeks to preserve the element of "fortuity"; a "fundamental principle" of insurance law. *See* Keeton & Widiss, *Insurance Law* § 5.3(a), at 475. To allow an insured to be indemnified for anticipated losses, the Ohio Supreme Court noted, would render an insurance company's risk "incalculable" and, therefore, liability policies rightfully exclude such losses. *Thompson,* 491 N.E.2d at 691.

The aim of the common law of intentional torts, however, encompasses a somewhat broader range of losses. There, an actor is held responsible for those results he purposefully causes and, in addition, those results that were so substantially certain to flow from his acts that the law should presume those results to have been "intended." In *Jones,* the Ohio Supreme Court rejected the idea that an employee must show that it was his employer's purpose to injure him in order to recover in tort. Rather the court held that the law of intentional torts also condemns actions of an employer taken "with the belief that such injury is substantially certain to occur." *Jones,* 472 N.E.2d at 1051. The focus in *Jones,* however, was not the employer's actual belief but rather the near-certainty of the risk. *See Jones,* 472 N.E.2d at 1051–52 (holding plaintiffs' complaint alleging that employer "knew or should have known" to be a "sufficient allegation of intentional misconduct").[3]

Thus, in the Viocks' case, decided under *Jones,* S–W could have been found liable for an intentional tort on either of two grounds: (1) that it had acted in the face of a very great risk that injury to Viock would occur, a risk of which S–W was *actually* aware; or (2) that it had acted in the face of a very great risk that injury to Viock would occur, a risk of which S–W was not aware but of which it *should have been* aware. Under the first alternative, it would appear that coverage is precluded by the "expected or intended" clause in that the injury to Viock could fairly be said to have been expected.[4] Under the second alternative, however, coverage is not precluded because the clause, by its own terms, excludes only injuries expected or intended "from the standpoint of the insured" and, therefore, does not extend to injuries the insured "should have expected," but did not actually and subjectively expect.[5]

---

3. In *Van Fossen v. Babcock & Wilcox Co.,* 36 Ohio St.3d 100, 522 N.E.2d 489 (1988), the Ohio Supreme Court revisited, with the express purpose of "significantly limiting" the holding of *Jones. Id.* 522 N.E.2d at 504. To recover, the court held that an employee must prove that (1) the employer had *actual* knowledge of "the existence of a danger[ ] ... within his business operation," and (2) that the employer had *actual* knowledge that "harm to [the employee] would be a substantial certainty...." *Id.*

4. Thus, under *Fossen*'s requirement of actual knowledge, intentional tort liability would be coextensive with the "expected or intended" clause in the GCL policies. S–W's liability, however, arose under the more-inclusive *Jones* standard.

It should also be noted that *Fossen,* as written, is not even the law in Ohio today. The pendulum reversed course again in *Fyffe v. Jeno's, Inc.,* 59 Ohio St.3d 115, 570 N.E.2d 1108, 1111–12 (1991), when the Ohio Supreme Court eased *Fossen*'s strict requirements and permitted liability even without a showing of actual knowl-

edge that the employee's injuries were substantially certain to occur.

5. With respect to this issue, the Kentucky Supreme Court recently stated:

The "expected or intended" exception is inapplicable unless the insured specifically and subjectively intends the injury giving rise to the claim.... We believe this to be the majority rule, and we agree that if injury was not actually and subjectively intended or expected by the insured, coverage is provided even though the action giving rise to the injury was intentional and the injury foreseeable....

.... The policies here state that the insurer has a duty to indemnify or defend the insured for damage if the damage was neither expected nor intended *from the standpoint of the insured.* They do not say from the standpoint of a reasonable person....

.... [Therefore,] we must reject the objective or foreseeability standard....

*James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co.,* 814 S.W.2d 273, 278–79 (Ky.1991) (citations omitted) (emphasis added).

The record discloses no basis for determining which of these two alternatives the Viocks' jury chose in holding S–W liable. The only explicit findings of fact concerning S–W's liability to the Viocks comes from the jury interrogatories, none of which required a finding that S–W actually "expected or intended" Viock's injury. Nor do the jury instructions given in the Viocks' case resolve this fact question in favor of the appellee-insurers:

> Now as I have defined for you during the trial, an intentional tort occurs when one is intentionally doing that which is wrong, or intentionally failing to do that which should be done. The circumstances must also disclose that the Defendant *knew or should have known* that such conduct would probably cause injury to the Plaintiff.... Wanton misconduct implies a failure to use any care for the Plaintiff and an indifferance [sic] to the consequences when the probability that harm would result from such failure is great. And such probability is *known or ought to have been known* by the Defendant.

*Viock v. Stowe–Woodward Co.*, No. E–84–27, 1986 WL 3254, at *12–13 (emphasis added) (holding that these instructions adequately convey the law as set forth in *Jones* ).

Accordingly, on the record presented, we hold that there is a genuine issue of material fact regarding whether Viock's injuries were actually "expected or intended" from the standpoint of S–W, or whether S–W merely "should have expected" Viock's injury under the *Jones* standard. To the extent that the summary judgments in favor of the appellee-insurers were based on the "expected or intended" clause, those judgments are vacated.

The GCL and E/U insurers place principle reliance on, and the district held that its decision was controlled by, *Wedge Products, Inc. v. Hartford Equity Sales Co.*, 31 Ohio St.3d 65, 509 N.E.2d 74 (1987). There, the court held that "[a]n intentional tort allegedly committed by an employer against its employee is not covered by an insurance policy which provides protection for bodily injuries 'neither expected nor intended' by the employer." *Id.* 509 N.E.2d at 76. *Accord Continental Ins. Co. v. American Shipbuilding Co.*, No. 88–3955, 1989 WL 124304, at *2 (6th

Cir.1989) (unpublished decision, *see* 6th Cir.R. 24(c)) (following *Wedge* and holding that injuries from intentional torts are necessarily "expected or intended"). We do not believe that *Wedge* is controlling.

The Ohio Supreme Court based its decision in *Wedge* on two grounds: (1) that it appeared impossible to have "committed [the] acts with the belief that [the plaintiffs] were substantially certain to be injured, yet not have 'expected' such injuries to occur"; and (2) that "public policy is contrary to insurance against intentional torts." *Wedge,* 509 N.E.2d at 75.

The first ground, the "coextensive" argument, does not apply where, as here, the liability could have been imposed on the grounds that S–W should have been aware of the risk, but without any showing that S–W actually expected or believed that Viock was substantially certain to be injured. Therefore, the *Wedge* court's first ground of decision is inapplicable here.

The "public policy" basis for the decision in *Wedge* was, we believe, the court's dominant concern. At the time *Wedge* was written, any construction of the policy language resulting in coverage would have been nullified by the then-perceived public policy. Thus, the court was not squarely faced with the question of whether *Jones* and the "expected or intended" clause are coextensive. We are convinced that, if the Ohio court were to reexamine this issue in light of the changes in public policy announced in *Harasyn*, the court would determine that the "expected or intended" is limited to instances of *anticipated* effects, *see Thompson*, 491 N.E.2d at 691, and, therefore, is not necessarily coextensive with the scope of liability under *Jones.*

Our conclusion is supported by *Physicians Ins. Co. of Ohio v. Swanson*, 58 Ohio St.3d 189, 569 N.E.2d 906 (1991), the only pronouncement of the Ohio Supreme Court on the applicability of the "expected or intended" clause since *Harasyn*. There, the court limited the application of "expected or intended" clauses to situations in which "the injury itself was expected or intended. It is not sufficient to show merely that the act was intentional." *Id.* 569 N.E.2d at 911. In the Viocks' case, the jury's findings that S–W's

*conduct* was intentional are, therefore, irrelevant to the applicability of the clause and the jury instructions permitting recovery regardless of whether S–W actually expected, or merely should have expected, the injuries to Viock, create a genuine issue of material fact as to whether the "expected or intended" clause should apply.

### 2. WC/EL policies

#### a. No coverage exists for S–W's Ohio operations

■ S–W's WC/EL insurers argue that there can be no coverage under the WC/EL policies because those policies do not apply to S–W's operations in Ohio. The district court held that, under the plain language of the policy, Coverage B—the portion of the policy providing Employer's Liability coverage—did apply to the S–W's Ohio operations. We agree.

Coverage B of the WC/EL policies promises:

> To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury by accident or disease, including death at any time resulting therefrom.
> (a) sustained . . . by any employee of the insured . . . in operations in a state designated in Item 3 of the declarations. . . .

Item three of the declarations states, in its entirety:

> Coverage A of this policy applies to the Workmens' Compensation Law and any Occupational Disease Law of each of the following states: Mass., Georgia, La., Ka., N.C., S.C., Wisc. and N.Y.

There is also an endorsement to the policy, however, entitled "BROAD FORM ALL STATES ENDORSEMENT" which provides, in pertinent part:

> 1. If the insured undertakes operations in any state not designated in Item 3 of the declarations, other than Nevada, North Dakota, *Ohio*, Washington, West Virginia or Wyoming, *Coverage A* applies to such operations.
> . . . .
> 3. *Coverage B* applies to operations of the insured covered by this endorsement. The limit of liability for bodily injury by disease, including death resulting at any time

therefrom, applies *as though each state in which such operations are conducted were designated in Item 3 of the declarations.*
> 4. The word "state" as used in this endorsement means *any* State of the United States of America and District of Columbia.
> . . . .
> 8. All of the provisions of the policy, insofar as such provisions are not inconsistent herewith, are applicable to the insurance afforded by the policy by virtue of this endorsement.

[Emphasis added.]

The WC/EL insurers argue that the application of Coverage B under Paragraph 3 of the endorsement is subject to the same list of excluded states as the application of Coverage A (Workers Compensation Insurance) in Paragraph 1 of the endorsement. We reject such a strained interpretation.

The plain language of the endorsement, in Paragraphs 4 and 8, shows that, except where otherwise stated, the endorsement extends the full extent of coverage under the main policy to all of S–W's operations in any state in the union. Paragraph 1 limits this extension by exempting the application of Coverage A (Workers Compensation) to S–W's operations in Ohio. The parties agree that this exemption reflects the fact that, at the time the policy was issued, Ohio's Workers Compensation scheme was monopolistic, i.e. all claims were paid from the state fund, and the purchase of private insurance to cover loss within the Workers Compensations scheme was prohibited by law. *See* Ohio Rev.Code § 4123.82(A).

Paragraph 3, however, which determines the extension of Coverage B (Employers Liability) insurance to "ALL STATES," contains no such restriction or exemption. Rather, it extends Coverage B to the limits of the endorsement, i.e. "ALL STATES," and then specifically provides that the limits of policy coverage apply there "as though each state in which such operations are conducted were designated in Item 3 of the declarations." Thus, Ohio—inasmuch as it is a state "in which such [S–W's] operations are conducted"—is treated as though it were specifically

listed in Item 3 of the declarations and, therefore, is included within the coverage provisions of Coverage B. Paragraph 3 of the endorsement contains no express limitations as to the extension of Coverage B and we decline the appellee-insurers' invitation to infer one. In this regard, the decision of the district court is affirmed.

### b. Viock's injuries did not arise "out of and in the course of" his employment with S–W

S–W's WC/EL insurers argue that no coverage exists for S–W's liability to the Viocks because, under the terms of the policies, the insurers are only obligated:

> To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury by accident or disease . . .
>
> (a) sustained in the United States of America . . . by any employee of the insured *arising out of and in the course of his employment.* . . . [Emphasis added.]

These insurers contend that an intentional tort by one's employer cannot possibly "arise out of and in the course" of one's employment. The district court found the insurer's argument persuasive and granted summary judgment to the WC/EL insurers on this basis. We disagree.

It is undisputed that Viock's injuries were caused by his long-term exposure to toxic chemicals and congestive dusts *at his work.* But for his job, there is no question that Viock would not have sustained these injuries. It strains credulity, therefore, for the appellee-insurers in this case to contend that these injuries did not "arise out of and in the course of" Viock's employment.

In support of their assertion, the WC/EL insurers cite two Ohio Supreme Court cases, neither of which concerned the construction of an Employers Liability insurance contract. *See Brady v. Safety–Kleen,* 61 Ohio St.3d 624, 576 N.E.2d 722, 730 (1991) (Ohio statute purporting to grant exclusive jurisdiction to an administrative agency to award damages in employer-employee intentional tort cases held unconstitutional); *Blankenship,* 433 N.E.2d at 576 (employer has no immunity from common law causes of action brought by its employees arising out of its own intentional torts).

These cases do not stand for the proposition that, where an employee is injured by his employer's intentional tort, the employee's injuries did not "arise out of and in the course of" his employment within the meaning of that language in an Employers Liability insurance contract. Further, there is both persuasive and controlling Ohio precedent to the contrary.

In *Jones,* the court held that an employee was free to pursue workers compensation benefits for his injury without prejudicing his common law action for intentional tort and, in fact, could recover in both. *Jones,* 472 N.E.2d at 1054–55. Thus, an injury could "arise out of and in the course of" an employee's employment and yet also be the product of his employer's intentional tort. Moreover, in *Harasyn,* the court held that an employer was covered under an Employers Liability insurance policy for liabilities arising out of its intentional torts. The endorsement under which coverage was found contained language substantially similar to that in the WC/EL policies in this case, including the provision that the liability be based upon injuries "arising out of and in the course of [the employee's] employment by the Insured." *Harasyn,* 551 N.E.2d at 963. The court construed this provision and held that, "*[o]n its face,* that coverage reaches the [intentional tort] claims in this case." *Id.* at 966 (emphasis added).

On the basis of *Jones* and *Harasyn,* therefore, we hold that the limitation of coverage under an Employers Liability policy to injuries "arising out of and in the course of" the injured employee's employment means no less and no more than it says: the fact of the employee's employment must be causally related to the injuries. Accordingly, we hold that Viock's injuries "aros[e] out of and in the course of" his employment with S–W. To the extent that the summary judgments in favor of the WC/EL insurers were based upon a contrary conclusion, those judgments are vacated.

### III. Individual Insurers

Having resolved these general issues, we turn to the specific arguments raised by each

insurer in support of summary judgment on the issue of coverage.

### A. Lumbermens

Lumbermens provided three types of policies to S–W: GCL, WC/EL and E/U. The summary judgments with respect to Lumbermens' GCL and E/U policies are vacated on the grounds that genuine issues of material fact remain. *See* Section II.C.1., *supra.*

Lumbermens' first two arguments with respect to its WC/EL policy have been disposed of in Section II.C.2., *supra.* Lumbermens also argues that coverage should be denied because Viock's exposure to the injurious conditions continued beyond the period of time covered by the Lumbermens policies and because notice of S–W's potential loss was not timely in that the Viocks' suit was filed thirty-seven months after the end of Lumbermens' coverage. Because the district court did not reach these issues, and because Lumbermens' ability to raise them is the subject of S–W's waiver and estoppel claims concerning which the district court has deferred judgment, we decline to affirm summary judgment in favor of Lumbermens on this basis. Therefore, that judgment is vacated and we remand this issue, together with the issue of Lumbermens' liability on its GCL and E/U policies, to the district court for further proceedings.

### B. Travelers

Travelers issued both GCL and WC/EL policies to S–W. We have rejected Travelers's sole argument in favor of summary judgment on its GCL policy. *See* Section II.C.1., *supra.* This issue, therefore, is remanded for further proceedings.

The first two arguments Travelers raises with respect to its WC/EL policy have also been resolved against it. *See* Sections II.B. and II.C.2.b., *supra.* The Travelers policy limits coverage, as did the policies from Lumbermens, based upon the timing of injuries caused by "accident" and injuries from exposures causing "disease." However, because Travelers has not raised this issue, the question of Travelers's liability under its

WC/EL policy is remanded, together with the issue of its liability under its GCL policy, to the district court for further proceedings.

### C. Aetna

Aetna provided only WC/EL policies to S–W. Its two "plain language" arguments against coverage have been rejected. *See* Section II.C.2., *supra.* Similarly, Aetna's argument in favor of an implied exclusion for post-issuance changes in the law has also been rejected. *See* Section II.B., *supra.*

Aetna also argues that coverage is precluded under a clause which limits coverage to those employee injuries "for which no benefits are payable under the Workmen's Compensation Laws...." Here, Aetna argues, benefits were payable, and in fact were paid, to Viock and, therefore, there is no coverage. We disagree. S–W's intentional torts are not covered by Ohio's workers compensation laws, and no such benefits are "payable" under those laws. *Blankenship,* 433 N.E.2d at 576. The monies Viock received in 1976 are unrelated to the Viocks' common law claims against S–W in 1981. This point is denied.

For the foregoing reasons, we hold that there are no genuine issues of material fact regarding the question of S–W's coverage for Viock's injuries under the Aetna WC/EL policy in this case.[6] The plain language of that policy provides coverage to S–W. Accordingly, and to the extent not inconsistent with Section II.A.3., *supra,* we reverse the summary judgment in favor of Aetna and remand with instructions for the district court to enter summary judgment for S–W.

### D. Weavers

Weavers sold E/U policies to S–W for a period of time running from before Viock's termination to after his filing of the underlying state tort action. Weavers' policies provide excess coverage for only those losses covered by the Aetna WC/EL policies. As noted in the preceding section, this is such a loss. The Weavers policies, however, further

---

**6.** Aetna's policy contains the same restrictions regarding the timing of covered injuries and claims as those in the Lumbermens and Travelers policies. These provisions pose no obstacle

to summary judgment against Aetna, however, as its coverage extended beyond the last day of Viock's employment.

limit coverage to losses stemming from "occurrences." As we held in Section II.C.1., *supra,* the applicability of this provision presents an issue of fact and may not be decided on summary judgment. Therefore, we vacate the summary judgment in favor of Weavers and remand this portion of the case to the district court for further proceedings.

### E. ELAC

ELAC sold E/U policies to S–W during the period of Viock's employment and injury. ELAC's sole argument against coverage has been rejected in Section II.C., *supra.* Therefore, we vacate the summary judgment in favor of ELAC and remand this portion of the case to the district court for further proceedings.

### F. AHAC

AHAC sold E/U policies to S–W during the period of Viock's employment and injury. AHAC's first argument against coverage has been rejected in Section II.C., *supra.* AHAC's second argument is based on a policy endorsement which provides:

> It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gasses, waste materials or other irritants, contaminants or pollutants, into or upon land, the atmosphere, or any watercourse or body of water; but this exclusion does not apply if such discharge dispersal, release or escape is sudden and accidental.

Because it is undisputed that Viock's injuries were caused by his exposure to highly-volatile, toxic cements and solvents as well as various congestive dusts, AHAC argues that the "pollution exclusion" set out above precludes coverage.[7] We disagree.

For the exclusion to apply, its terms require that a "discharge, dispersal, release or escape" of the offending substances occur. A "discharge" is defined as "a flowing or issuing out." To "disperse" is defined as "to cause to breakup and go in different ways"; "to cause to become spread widely." A "re-

lease" is defined as "the act of liberating or freeing: discharge from restraint." An "escape" is defined as an "evasion of or deliverance from what confines, limits, or holds." *Webster's Third New International Dictionary* 644, 653, 1917, 774 (1986).

The fumes and dust that injured Viock, it is undisputed, were confined inside S–W's plant and, in fact, were confined to that portion of that plant involved in the gluing process in which Viock worked. It strains the plain meaning, and obvious intent, of the language to suggest that these fumes, as they went from the container to Viock's lungs, had somehow been "discharged, dispersed, released or escaped." Or, considering that the fumes were confined to Viock's work area, that they had been discharged into the "atmosphere," as that word is ordinarily understood. *See Continental Cas. Co. v. Rapid–American Corp.,* 80 N.Y.2d 640, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993) (pollution exception not applicable injuries from exposure to asbestos in confined area rather than "atmosphere"). Without belaboring the obvious, we hold that this exclusion is intended to shield the insurer from the liabilities of the insured to outsiders, either neighboring landowners or governmental entities enforcing environmental laws, rather than injuries caused by toxic substances that are still confined within the area of their intended use.

AHAC places principle reliance on *Hybud Equip. Corp. v. Sphere Drake Ins. Co.,* 64 Ohio St.3d 657, 597 N.E.2d 1096 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1585, 123 L.Ed.2d 152 (1993). *Hybud,* in our view, while primarily concerned with the "sudden" exception to this exclusion, actually supports our reading of this clause. There, the insured, a former owner of a landfill and transporter of waste material, was sued by a neighboring land owner, the United States Environmental Protection Agency and the State of Ohio. Thus, the application of the exclusion was so obvious that it was not even discussed. Rather, attention focused on the plain meaning of the words "sudden and accidental."

---

7. We note that this exclusion appears in several of the policies purchased by S–W. To date, however, none of the other insurers have argued its applicability.

Accordingly, we hold that Ohio courts would limit the use of this exclusion to its plain language and obvious purpose. Therefore, the issue of AHAC's liability on its E/U policies is remanded to the district court for further proceedings regarding the applicability of the "expected or intended" clause.

## G. Youell

 Youell issued a series of Work-in-Progress policies (WIP's). These policies are in two parts: (1) an "all-risk" policy covering all materials and work-in-progress; and (2) a general liability policy providing:

To cover the legal liabilities of the Assured world wide to Third Parties and/or other interests in respect of loss of life and/or personal injury and/or damage to property and/or other liabilities howsoever and wheresoever arising in connection with their business ... including legal liabilities arising out of any fault or defect ... or arising in any other circumstance howsoever ....

Excluding liabilities arising under—

(a) Road Traffic Acts or equivalent foreign legislation.

(b) Any Employers' Liability or Workmen's Compensation legislation.

As we have repeatedly noted, S–W's liability to the Viocks arose under the common law and specifically did not, and could not, arise under Ohio's workers compensation scheme. *Blankenship*, 433 N.E.2d at 576. Therefore, Youell's protestations to the contrary notwithstanding, we hold that neither of the two express exclusions contained in the WIP policy preclude coverage.

The district court granted summary judgment in favor of Youell on the ground that, because the WIP policies were issued prior to the *Blankenship* decision, such liabilities could not have been contemplated. As we held in Section II.B., *supra*, we reject this argument.

Accordingly, and to the extent not inconsistent with Section II.A.3., *supra*, we reverse the summary judgment in favor of Youell and remand to the district court for further proceedings, not inconsistent with this opinion, with respect to S–W's claims against Youell.

## IV.

For all of the foregoing reasons, we rule as follows: [8]

1. To the extent of the Viocks' $2,500,000 punitive damages award, all the summary judgments entered in favor of the insurers are **AFFIRMED.**

2. In all other respects, however, the summary judgments entered in favor of the insurers are **VACATED.**

3. The case is **REMANDED** to the district court, with respect to Youell's liability under the policies issued to S–W, for further proceedings not inconsistent with this court's opinion.

RYAN, Circuit Judge, concurring in part and dissenting in part.

Although I concur in much of what is said in the majority opinion, I do not agree that the district court's award of summary judgment to the GCL and E/U insurers must be reversed. The majority opinion holds that there is a question of fact whether S–W Industries acted with knowledge that injury to Viock "was substantially certain to occur." I do not believe this conclusion is supported by Ohio law, or by the law of the case.

In Ohio, an employer is immune from liability for workplace injuries, absent a finding that it committed an intentional tort. *Blankenship v. Cincinnati Milacron Chem., Inc.,* 69 Ohio St.2d 608, 433 N.E.2d 572, 575–77 (1982). This intentional tort exemption to workers compensation exclusivity encompasses those acts "committed with intent to injure another, or committed with belief that such injury is substantially certain to occur." *Jones v. VIP Development Co.,* 15 Ohio St.3d 90, 472 N.E.2d 1046, 1046 (1984).

In *Wedge Products, Inc. v. Hartford Equity Sales Co.,* 31 Ohio St.3d 65, 509 N.E.2d 74 (1987), the Ohio Supreme Court held that an employer's intentional tort, as defined in *Jones,* could not be covered by GCL policy language identical to that here, because the

8. This opinion constitutes the unanimous view of the court as to all sections, with the exception of Section II.C.1., from which Judge Ryan dissents, and Section II.C.2.a., from which Judge Joiner dissents.

policy excluded expected or intended injuries, and, by definition, work-related intentional tort injuries are expected or intended. The majority maintains, however, that *Wedge* does not control this case, apparently on the theory that in equating "expected or intended" injuries with the belief that injuries are "substantially certain to occur," the *Wedge* court did not have in mind situations where the employer should have, but may not have known that injury was substantially certain to follow. And Viock's jury, the majority correctly observes, found S–W liable for intentional tort upon an instruction that permitted the verdict if the jury found that the risks to Viock merely "should have been known." According to the majority, this is not the kind of intentional tort that is the equivalent of an "expected or intended" injury that the *Wedge* court held would preclude insurance coverage.

In my view, that is not a correct reading of *Wedge.* That court did not condition its ruling on a finding that the employer-insured had acted with knowledge that injury was substantially certain to occur, or with any other specific state of mind. There were no findings of fact in *Wedge.* Rather, the case was a declaratory judgment action brought by the insurer, who was arguing that it had no duty to defend a work-related intentional tort action because its policy excluded coverage for expected or intended injuries. Thus, the court was expressing a general rule that work-related intentional torts are necessarily expected or intended, and therefore not covered by policies excluding expected or intended injuries.

The majority opinion also contends that the *Wedge* decision was really driven by public policy concerns, now obviated by subsequent court decisions. It is difficult to discern the basis for this conclusion. Only after concluding that there was no "possibility of coverage" did the court mention "public policy," and then only in the categorical statement that "public policy is contrary to insurance against intentional torts." *Id.* 509 N.E.2d at 76.

The Ohio Court of Appeals expressly held that the *Viock* trial court's "knew or should have known" instruction was sufficient to support an intentional tort verdict because it was synonymous with the "substantial certainty" language of *Jones. Viock v. Stowe-Woodward Co.,* No. E–84–27, 1986 WL 3254, slip op. at 14 (Ohio App.1986). That being so, the intentional tort liability imposed on S–W is precisely within the *Jones* definition of work-related intentional tort that *Wedge* holds "is not covered by an insurance policy which provides protection for bodily injuries 'neither expected nor intended' by the employer." *Wedge,* 509 N.E.2d at 76. It is indisputable, I think, that under Ohio law injuries that are a "substantial certainty" are "expected or intended." I would affirm the district court's summary judgment for the GCL and E/U insurers. Otherwise, I concur in the majority opinion.

JOINER, District Judge, concurring in part and dissenting in part.

Although at first blush *Wedge Products, Inc. v. Hartford Equity Sales Co.,* 31 Ohio St.3d 65, 509 N.E.2d 74 (1987), appears to provide a solution to the intentional tort coverage problem in this case, the opinion by Judge Suhrheinrich makes clear that *Wedge* should be distinguished. The opinion also makes clear that Ohio's developing law in this area does not support a reading of *Wedge* that would deny coverage. Our task is to make our best effort in finding and applying Ohio law. Judge Suhrheinrich's opinion reaches the result most likely to be reached if this case were to be decided by the Ohio court. For these reasons, I join in Part II.C.1. of the opinion.

I part company with Judge Suhrheinrich in his analysis of the geographical scope of the coverage afforded by the Aetna and Lumbermens WC/EL policies, specifically, the construction in Part II.C.2.a. of the opinion of the Broad Form All States Endorsement. Both policies include standard form, identical versions of this endorsement.

To discern the meaning of the All States Endorsement, I start with the basic insuring agreement. The WC/EL policies at issue have both Coverage A, pertaining to benefits payable under workers' compensation laws, and Coverage B, entitled "Employer's Liability." The declaration pages of the policies state in item 3 that Coverage A applies to the listed states, and no policy includes Ohio.

The policies further provide that Coverage B exists as to operations of the insured in the states listed in item 3 of the declarations.

The All States Endorsement provides:

1. If the insured *undertakes operations in any state not designated in Item 3* of the declarations, *other than ... Ohio* [and five other states], Coverage A applies *to such operations.*

(Emphasis added.) Like in the basic insuring agreement, the scope of Coverage B under the All States Endorsement tracks the scope of Coverage A:

3. Coverage B applies to *operations of the insured covered by this endorsement.* The limit of liability for bodily injury by disease, including death resulting at any time therefrom, applies as though each state *in which such operations are conducted* were designated in Item 3 of the declarations.

(Emphasis added.) The term "this endorsement" clearly applies to the single endorsement entitled "All States Endorsement," and embodies all of the limitations in that endorsement. Two conclusions flow from this language: (1) the endorsement limits itself to *operations outside Ohio* and five other states; and (2) Coverage B is limited to *operations of the insured covered by this endorsement.* The only rational conclusion is that the endorsement was intended *not* to cover Ohio.[1]

If this were the only provision regarding the geographical scope of the coverage afforded by the WC/EL policies, then coverage would not exist as to either of the Lumbermens or Aetna policies. However, Aetna has an additional endorsement that provides coverage for the loss at issue here.

Aetna's Employers' Overhead Endorsement provides that the insurance afforded under Coverage B also applies to bodily injury by accident *or* disease sustained by an employee of the insured, employed in one of the designated states, *including Ohio,* arising out of and in the course of his employment by the insured, "but only with respect to ... [s]uch injury or death for which no benefits are payable under the Workmen's Compensation Laws of such state[.]" As we hold in Part III.C. of the opinion, Aetna does not benefit from this limitation on coverage, because workers' compensation benefits were not payable to Carl Viock for his intentional tort injury.

Thus, I agree that S–W is entitled to entry of summary judgment against Aetna. Unlike Judge Suhrheinrich, however, I do not base this conclusion on the All States Endorsement but, rather, on the Employers' Overhead Endorsement. The very existence of the Employers' Overhead Endorsement supports the conclusion that the All States Endorsement does not provide coverage. Significantly, the states *ex* cluded by the All States Endorsement are *in* cluded in the Employers' Overhead Endorsement (except West Virginia, which is excluded from both). The opinion's reading of the All States Endorsement renders the Employers' Overhead Endorsement a nullity.

My view of the All States Endorsement would have a practical effect only on the disposition of Lumbermens' appeal. Thus, I concur in the result reached as to Aetna, and dissent, for the reasons stated, with respect to the disposition of Lumbermens' liability on its WC/EL policies only.

---

1. The opinion relies on paragraphs 4 and 8 of the endorsement, but these provisions do not provide guidance one way or the other as to the geographical scope of Coverage B. Paragraph 4 simply defines the word "state" (in contrast to, *e.g.,* Puerto Rico and Canadian provinces), and does not purport to enumerate *which* states are covered. Paragraph 8 simply makes all other consistent provisions of the policy applicable to the insurance provided by the endorsement.